2015 IL App (1st) 133017

FIRST DIVISION
AUGUST 10, 2015

No. 1-13-3017

| | | |
|---|---|---|
| HARRIS BANK, N.A., | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff | ) | Cook County. |
| | ) | |
| (EDC Fund 2, LLC, | ) | |
| Plaintiff-Appellee), | ) | |
| | ) | No. 09 CH 12471 |
| v. | ) | |
| | ) | |
| EMMA HARRIS, Not Personally, But as Trustee On Behalf of | ) | |
| the Emma L. Harris TRUST Dated October 21, 2003; | ) | |
| EMMA L. HARRIS, | ) | Honorable |
| | ) | Michael J. Otto, |
| Defendants-Appellants. | ) | Judge Presiding. |

_____

JUSTICE CUNNINGHAM delivered the judgment of the court, with opinion.
Presiding Justice Delort and Justice Harris concurred in the judgment and opinion.

**OPINION**

¶ 1     Emma L. Harris (Emma), individually and as trustee on behalf of the Emma L. Harris

Revocable Trust Dated October 21, 2003, appeals from an order of the circuit court of Cook

County denying her amended petition pursuant to section 2-1401 of the Illinois Code of Civil

Procedure (735 ILCS 5/2-1401 (West 2012)), seeking relief from a September 2011 order

confirming the foreclosure sale of her former property.

¶ 2                                 BACKGROUND

¶ 3     Emma, through her revocable living trust, was the owner of real property at 6609-11 and

6605-07 South Greenwood Avenue in Chicago (the property), which consists of two adjoining

residential apartment buildings containing twelve apartment units.  According to Emma, a senior

citizen who is at least in her late eighties,[1] she and her late husband purchased one of the buildings in 1980 and the second in 1989. Emma lived within one of the apartments at the property, and rented out other apartment units as a source of income.

¶ 4    According to Emma, after her husband passed away in 1995, she managed the property independently until approximately 2003, when she hired a property manager. Emma alleges that the manager failed to collect rents due from tenants and otherwise mismanaged the property, "such that rents collected did not cover the mortgage payments, utilities and maintenance on the buildings, leaving [Emma] in increasing debt." By late 2006, due to the negligence of the property manager, the property was "fal[ing] into disrepair," and suffered from outstanding building code violations, lapsed insurance coverage, and overdue utility bills. As a result, the apartments at the property could not be rented for full market value, and there were only three regularly paying tenants at the property besides Emma.

¶ 5    In November 2006, Emma sought a refinance loan on the property from Harris Bank, N.A. (the bank), who was the original plaintiff in this litigation. According to Emma, she sought the 2006 loan to pay off "two existing mortgages and other outstanding property-related bills." Emma met with a bank employee, Allison Regina Bell, in connection with the loan. Emma claims that she informed Bell that she was on a limited income from Social Security and a pension, and disclosed that there were only a few paying tenants at the property. However, according to Emma, Bell filled out her loan application with false information regarding the

---

[1]Emma's filings in the trial court are inconsistent regarding her precise age. Her original section 2-1401 petition, filed in December 2012, states she is "in her eighties." Other submissions to the trial court state that she was either 84 or 86 years old at the time the mortgage in question was executed in 2006, which suggest that Emma is currently in her nineties.

financial health of the property – stating that the apartment buildings "were fully occupied" with paying tenants—in order to ensure that the bank would approve a loan to Emma. Emma claims that she never saw and was later denied access to the loan application that was prepared by Bell.

¶ 6    On November 29, 2006, Emma entered into a promissory note with the bank under which she borrowed the principal amount of $350,000 to be repaid at an annual interest rate of 7.070%. The note called for repayment over three years, specifying that Emma "will pay this loan in 35 regular payments of $2,369.15 each and one irregular last payment estimated at $341,465.74," with the last payment due on December 1, 2009. Emma's indebtedness under the promissory note was secured by a mortgage on the property as well as an assignment of rents, both of which were also dated November 29, 2006. Notably, the promissory note executed by the bank and Emma stated that the address of the "borrower" was at 7337 Shore Drive in Chicago, a different address than the mortgaged property on Greenwood Avenue. Emma's submissions to the trial court indicated this was the address of Emma's daughter, yet the record is unclear why that address was listed on the loan document.

¶ 7    Emma does not dispute that she executed the promissory note and mortgage. However, she claims that the bank did not explain to her, and that she did not understand, the repayment terms of the loan and the corresponding risk of default and foreclosure. In fact, Emma claims that the bank knew and intended that Emma, as an elderly person with limited income, would not be able to fulfill the loan's repayment terms.

¶ 8    It is undisputed that Emma did not repay under the terms of the loan. On March 19, 2009, the bank filed a complaint seeking foreclosure of the mortgage on the property based on Emma's payment default, claiming an unpaid principal balance of $343,253.90.

¶ 9    On April 6, and April 9, 2009, the Cook County sheriff attempted without success to serve Emma with the summons and complaint at 7337 South Shore Drive in Chicago, the address stated on the promissory note. Emma maintains that she did not reside at that address, but lived at an apartment at the mortgaged property.

¶ 10    In April 2009, the bank moved for immediate possession and appointment of a receiver of the property to collect rents and to show vacant units to potential renters. On April 17, 2009, the trial court granted the motion and appointed a receiver to manage the property and directed the receiver to file bimonthly reports. Beginning in August 2009, the receiver submitted periodic reports to the court, including information on rents collected from the property's tenants.

¶ 11    In light of the previous unsuccessful attempts to serve Emma, on August 26 2009, the court granted the bank's motion to appoint a special process server, LaSalle Process Servers. According to an affidavit executed by LaSalle Process Servers, Emma was served personally on September 30, 2009 at 7337 South Shore Drive. Emma disputes that she was served on that date.

¶ 12    Emma failed to respond to the complaint or otherwise appear in the action. On November 20, 2009, the bank moved for a default judgment and judgment of foreclosure and sale, supported by LaSalle Process Servers' affidavit of service. On December 14, 2009, the trial court entered a default judgment of foreclosure and authorized a sale of the property.

¶ 13    On February 23, 2010, Emma's first counsel in this action, attorney Glenda Gray, filed a general appearance in the trial court on behalf of Emma. However, attorney Gray filed no answer to the foreclosure complaint or any other filing on behalf of Emma.

¶ 14    On March 2, 2010, the bank filed a notice of sheriff's sale, specifying that the Cook County sheriff would sell the property by public auction on March 31, 2010. The record reflects

that on the day before the scheduled sale date, March 30, 2010, Emma (through attorney Gray) filed a Chapter 13 bankruptcy petition, postponing the sheriff's sale. The bankruptcy proceedings are not in the record on appeal. However, the parties' trial court filings acknowledge that Emma's first bankruptcy petition was dismissed, and that a second bankruptcy petition was also filed and dismissed prior to the eventual sheriff's sale of the property.

¶ 15 On August 13, 2010, the bank filed another notice of sheriff's sale, stating that the property would be sold at public auction on September 16, 2010. On September 3, 2010, attorney Gray filed a motion to withdraw which stated that Emma had elected to proceed with different counsel. The motion to withdraw was granted on October 4, 2010.

¶ 16 Emma's second counsel, Al Hofeld Jr., filed an appearance on behalf of Emma on September 13, 2010, three days before the scheduled sheriff's sale. On the same date, Emma filed an "emergency motion to stay sale" as well as an "emergency § 5/2-1301(e) petition to vacate the default judgment." 735 ILCS 5/2-1301(e) (West 2012).

¶ 17 In those September 2010 filings, Emma claimed she was never served personally with the foreclosure complaint and, for the first time, also alleged fraud and other misconduct by the bank in connection with originating the November 2006 loan. The emergency motion to stay the foreclosure sale claimed "this is an egregious case of predatory lending in which the bank knowingly exploited a vulnerable, 84-year-old woman by making her a loan that —— it knew at the time——she could not afford to repay and did so by inflating her income to get the loan through underwriting."

¶ 18 The emergency petition to vacate the default judgment sought leave to file an answer with affirmative defenses and counterclaims for: "improvident lending (i.e, making [Emma] a

loan the bank knew, at the time or origination, that she could not afford to repay), fraud (i.e., inflating her income to get the loan through underwriting) and discrimination based on age, sex and race (i.e., singling out and exploiting [Emma] because of her perceived vulnerabilities as a lone, elderly, African-American female in the marketplace)." As an exhibit to the petition to vacate the default judgment, Emma also included a proposed answer and counterclaims to the bank's foreclosure complaint which claimed that the promissory note was "void" because it resulted from the bank's fraudulent conduct. The proposed pleading alleged that the bank "originated the loan through fraud" as it "made her a loan that – it knew at the time – she could never afford to repay."

¶ 19    According to the proposed pleading submitted with the September 2010 petition to vacate the default judgment, Emma had been "referred by the trustee of her church to [the bank] for a refinance loan for her property." The bank's employee, Bell, allegedly filled out Emma's loan application and "falsified and misrepresented [Emma's] income during the underwriting process in order to get the loan approved." The proposed pleading claimed that Bell and the bank knew that "the loan terms were totally unsustainable on [Emma's] income" but that Bell "drew the loan in such a way as it would be approved by [the bank's] underwriting department." Emma sought to plead affirmative defenses including "fraud in the inducement" as well as violations of the federal Truth in Lending Act and Illinois Fairness in Lending Act, the Illinois Consumer Fraud Act, Equal Credit Opportunity Act, Civil Rights Act, Fair Housing Act, and unclean hands.

¶ 20    The trial court granted the emergency motion to stay the sheriff's sale and set a briefing schedule on the petition to vacate the default judgment. On October 5, 2010, the bank responded to the petition to vacate, claiming that Emma "ha[d] no meritorious defenses" and that denial was

independently warranted because Emma "ha[d] not been diligent in her defense of this matter or in bringing" the petition to vacate the default. The bank clamed that Emma's first counsel, who appeared in February 2010, had been aware of the default judgment, and that Emma offered no reason why it was not until September 2010 that she (through her second attorney) sought to vacate the default judgment or to assert any affirmative defenses. The bank also urged that Emma had been served, relying on the affidavit of service from the special process server.

¶ 21 On October 12, 2010, Emma submitted a reply which reiterated that the bank "intentionally defrauded" her "by originating a loan *** that it knew then would inevitably result in default and foreclosure" due to her inability to repay it. Emma argued that a judgment of default could be vacated even without a showing of diligence. Emma further argued that she was in fact diligent, again claiming that she was not personally served. Emma acknowledged that she had "filed two separate bankruptcies in an attempt to save her property and workout a payment she could afford," and argued this was "evidence not of a lack of diligence *** but of an abundance of diligence." As a "financially unsophisticated elder," she claimed that she "did not understand *** the events of fraud that occurred at origination until September 8, 2010, when she first met with [her second attorney]" and that her "inadvertence is excusable in the face of a much graver injustice committed by the bank."

¶ 22 On October 27, 2010, the trial court denied Emma's petition to vacate the December 2009 default judgment in an order stating that the basis of the denial was a "lack of due diligence." Although the appellate record does not contain a transcript of proceedings, Emma's subsequent motion to reconsider reflects that the trial court, in denying the petition, referenced: the affidavit of service on September 30, 2009, the fact that Emma's first attorney appeared in February 2010

and had repeatedly appeared before the court without challenging the December 2009 default judgment, and that Emma had filed for bankruptcy twice, shortly before the scheduled date of the sheriff's sale of the property.

¶ 23  On November 24, 2010, Emma filed a motion for reconsideration of the denial of the petition to vacate, arguing that the trial court erred by making "due diligence the sole or determining factor in its ruling" and had failed to adequately consider the equities of the situation.  The motion to reconsider included an affidavit from Emma in which she stated that she "did not become aware that there was a foreclosure case until sometime in January 2010" after which time she was referred to her first attorney.  Emma's affidavit acknowledged that her first attorney had "filed the two bankruptcy cases" but stated: "I do not know or understand why [her first attorney] did not do anything about the default judgment.  I was not aware of the default judgment until I met [Emma's second attorney]."

¶ 24  The affidavit further stated that Emma "was never personally served with a summons or complaint."  According to the affidavit, the address stated in the process server's affidavit, 7337 South Shore Drive in Chicago, (which was the address in the promissory note) was the address where Emma's daughter lived.  However, Emma stated that she lived at the foreclosed property, at 6607 S. Greenwood Avenue.

¶ 25  Pending decision on the motion for reconsideration, the court permitted the sheriff's sale to proceed.  The sale was finally held on February 23, 2011, at which time the bank purchased the property for $160,560.  After accounting for that sale amount, a deficiency in the amount of $312,085.58 remained on Emma's indebtedness under the terms of the promissory note.

¶ 26    On March 22, 2011, while the motion for reconsideration of the denial of her motion to vacate remained pending, Emma's second attorney filed a motion to withdraw, citing "irreconcilable differences" with respect to "matters of attorney-client communication."  On April 12, 2011, the court denied the motion to reconsider the denial of the petition to vacate the default judgment.  On April 19, 2011, the court granted the motion to withdraw by Emma's second attorney.

¶ 27    On May 17, 2011, the bank filed a motion to confirm the February 23, 2011 sheriff's sale of the property in the amount of $160,560, and additionally sought a deficiency judgment against Emma in the amount of $312,085.58.  In August 2011, Emma—through her third legal counsel, Kaplan Silverman LLC—filed a motion to vacate the February 23, 2011 sale.  That motion claimed that, after the sale was postponed from the previously scheduled date, the bank had failed to give notice by publication of the rescheduled sale date.  The bank filed a response arguing that republication of notice of the sale was not required because individual notice was provided to the parties, and that Emma's prior counsel had agreed to waive republication of notice.  On September 12, 2011, the court entered an order reflecting that Emma had withdrawn her motion to vacate the February 23, 2011 sale.

¶ 28    Also on September 12, 2011, the court entered an "order approving report of sale and distribution, confirming sale for deficiency judgment and for order of possession."  The order approved the February 23, 2011 sale as fair and proper and directed the sheriff to deliver a deed to convey title to the bank's assignee, Dearborn Street Holdings, LLC–Series 6 Harris/Greenwood (Dearborn), and specified that Dearborn would be entitled to possession of

the property after 70 days. The September 12, 2011 order also entered an *in personam* deficiency judgment in the amount of $312,085.58 against Emma.

¶ 29    On June 6, 2012, the property was sold by Dearborn to a third party, EDC Fund 2, LLC (EDC), which is the current plaintiff-appellee in this appeal. EDC, as the new owner of the property, filed a motion on July 23, 2012 to substitute itself as the plaintiff in this action. EDC's motion also stated that the sheriff had refused to evict Emma because the order failed to state her specific unit at the property, and thus requested modification of that order. On October 10, 2012, the court ordered Emma to file a response to EDC's motion. On December 10, 2012, Emma's fourth attorney, James Glass (Emma's counsel in this appeal), entered an appearance. Emma filed an opposition to EDC's motion on or about December 17, 2012.

¶ 30    Shortly thereafter, on December 20, 2012, Emma filed a petition pursuant to section 2-1401 of the Code of Civil Procedure seeking relief from the September 12, 2011 order confirming the sheriff's sale, as well as leave to file an answer with affirmative defenses and counterclaims. The section 2-1401 petition—much like the September 2010 motion to vacate default judgment filed by Emma's second attorney—was largely premised on allegations of fraudulent conduct by the bank and Bell, its employee. The section 2-1401 petition alleged that the bank "knew or should have known that the subject [bank] loan was unfair" and that Emma "did not understand or appreciate the high risk of early default on the [bank] loan as written" or the risk of foreclosure. The petition claimed that in order to qualify Emma for the loan, Bell "falsely notated on [Emma's] loan application *** that the building[s] were fully occupied with tenants paying $800 per month for rent, when this was not the case." The petition claimed that the bank made "an unfair predatory loan that had a high risk of early default as evidenced *** by

the fact that several months after the [bank] loan closed *** [Emma] was left with only a few thousand dollars from the principal loan proceeds, with no demonstrated ability to repay."

¶ 31 Under the heading "Due Diligence," the section 2-1401 petition acknowledged that Emma had previously been represented by other counsel in the foreclosure suit but alleged that "unbeknownst to [Emma] none of her attorney(s) ever filed an Answer and Affirmative Defense or Counterclaim" to the foreclosure complaint. According to the section 2-1401, petition, she "first discovered that no formal legal defense had been mounted in her behalf in the foreclosure suit in October 2012."

¶ 32 The petition alleged several "meritorious defenses and counterclaims to the foreclosure suit." Among these, Emma alleged "fraud in the inducement" as she "did not understand or appreciate the high risk of early default on the [bank] loan as written." The section 2-1401 petition also alleged that the bank failed to act in good faith, violated the Illinois High Risk Home Loan Act and the Illinois Consumer Fraud Act, engaged in "equity stripping" in violation of the Illinois Fairness in Lending Act and had violated "the Cook County predatory lending ordinance."

¶ 33 On January 16, 2013, the bank filed a motion to strike the section 2-1401 petition, arguing that Emma failed to set forth a meritorious claim, failed to demonstrate due diligence in presenting her claims in the underlying litigation, and failed to show due diligence in filing her petition. The bank pointed out that the claim of a "predatory" loan that the bank knew Emma would be unable to pay "was previously asserted by [Emma] in her September 13, 2010 Petition to Vacate Default Judgment" which had been denied in October 2010. The bank argued that the section 2-1401 petition "contains only unsupported, meritless claims that were already known to

[Emma] that could have been previously asserted throughout the underlying litigation." The bank further argued that Emma failed to act with due diligence in filing her petition, as it was "filed almost two years after the sheriff's sale was held and more than a year after" the sheriff's sale was confirmed in September 2011.

¶ 34    On March 13, 2013, the case was reassigned to a new trial judge following the recusal of the prior judge overseeing the matter.

¶ 35    On April 26, 2013, the trial court granted Emma leave to file an amended section 2-1401 petition. Also on that date, the court granted EDC's motion to be substituted as the plaintiff in place of the bank.

¶ 36    On April 29, 2013, Emma filed her amended section 2-1401 petition. The amended petition maintained the original petition's allegations of fraudulent conduct, including the allegations that Bell inserted false information on Emma's loan application that the apartments at the property "were fully or almost fully occupied with tenants paying approximately $800 per month for rent." The amended section 2-1401 petition further alleged that information derived from the court-appointed receiver's first report on the property further supported her allegations of Bell's fraudulent conduct, as "Bell's description [in the 2006 loan application] of the number of tenants and the amount of rent they were actually paying was at odds with that reported" by the court-appointed receiver. The amended section 2-1401 petition noted that the first report by the receiver, dated August 21, 2009, included a rent roll showing that there were only three tenants at the property besides Emma, and that those three tenants were paying monthly rents of only $400 and $550 for the months of June, July, and August 2009.

¶ 37    The amended section 2-1401 petition asserted the very same "meritorious defenses" set forth in the original section 2-1401 petition, including "fraud in the inducement," violation of the lender's duty to act in good faith, "equity stripping," and "violation of Cook County Predatory Lending Ordinance."  However, on the topic of due diligence, the amended petition added details regarding the alleged failures of Emma's prior attorneys, urging that "[t]o the extent that failure to file affirmative defenses or counterclaims in a foreclosure case constitutes legal negligence, the Court should find that mitigating circumstances preserve [Emma's] due diligence in the form of lack of cooperation between" her first two attorneys.  The amended section 2-1401 petition acknowledged that her second attorney (Hofeld) had filed a motion to vacate the default judgment in October 2010 which asserted affirmative defenses and counterclaims, but claimed "these were not specifically pleaded *** due to the lack of cooperation" between her first two attorneys, Gray and Hofeld.  The amended section 2-1401 petition alleged that "[e]ither attorneys Gray and Hofeld failed to communicate" or that their communication "was meaningless and ineffective as attorney Gray, for whatever reason, never worked up [Emma's] mortgage foreclosure affirmative defenses and counterclaims into a duly constituted defensive pleading that attorney Hofeld could have attached to his emergency motion to vacate" the default judgment.  Emma also submitted an affidavit in support of the amended section 2-1401 petition in which she stated that she had not learned until October 2012 that her prior attorneys had not filed an answer in the mortgage foreclosure case, repeating the allegations regarding the "lack of cooperation" between her first and second attorneys.

¶ 38    On May 10, 2013, EDC filed a response to the amended section 2-1401 petition that adopted the arguments that had been asserted in the bank's prior January 2013 motion to strike

the original section 2-1401 petition.  In addition, EDC's response made the argument that, as a subsequent purchaser of the property for value, the section 2-1401 petition could not deprive EDC of its interest in the property even if the petition was otherwise meritorious and asserted with due diligence.  On May 14, 2013, Emma filed a memorandum of law in support of her amended section 2-1401 petition, arguing, *inter alia*, that the "noncooperation of her first and second foreclosure defense attorneys thereby preserve[s] her due diligence."

¶ 39    On June 28, 2013, the trial court dismissed Emma's amended 2-1401 petition with prejudice "for lack of diligence."  On July 18, 2013, Emma filed a "motion for rehearing, retrial or modification of the June 28, 2013 judgment" pursuant to section 2-1203 of the Code of Civil Procedure.  735 ILCS 5/2-1203 (West 2012).  Emma argued that the trial court had not properly considered the "non-cooperation of Emma's first two foreclosure defense attorneys," which she claimed was "newly discovered evidence" as she claimed that she did not discover until October 2012 that her first two attorneys had failed to answer the complaint.  The motion for rehearing also claimed that the trial court did not properly consider the "newly discovered evidence" alleging that Bell falsely stated on Emma's November 2006 loan application that the rental units were "fully occupied with tenants paying approximately $800 per month for rent"; the motion for rehearing urged that these allegations were "corroborated by the receiver's rent roll showing the receiver's receipt of $3850 in *total* rents *** during the months of June, July, and August 2009."  The motion for rehearing also argued that the trial court had been "unduly persuaded" that the much earlier October 2010 ruling (by a different judge) finding a lack of diligence with respect to Emma's petition to vacate the default judgment governed the issue of diligence with respect to her section 2-1401 petition.

¶ 40    On September 4, 2013, the trial court denied Emma's motion for rehearing.    On September 19, 2013, Emma filed a notice of appeal.

¶ 41                                      ANALYSIS

¶ 42    Before we address the merits, we first address EDC's claim that we lack jurisdiction because Emma's notice of appeal was untimely.  In particular, EDC claims that Emma's failure to file her notice of appeal within 30 days following the trial court's dismissal of her amended section 2-1401 petition on June 28, 2013 deprives us of jurisdiction.  EDC acknowledges that within 30 days of the denial of the amended section 2-1401 petition, Emma filed a motion for rehearing of that decision.  EDC also does not dispute that after the September 4, 2013 denial of the motion for rehearing, Emma filed a notice of appeal within 30 days, on September 19, 2013. Nonetheless, EDC urges that the motion for rehearing did not toll the 30-day time to appeal from the June 28, 2013 dismissal.  Thus, EDC urges that Emma's failure to file a notice of appeal within 30 days of the June 28, 2013 dismissal order precludes appellate jurisdiction.

¶ 43    This question is determined by Illinois Supreme Court Rule 303 (eff. May 30, 2008) and Rule 304 (eff. Feb. 26, 2010).  Rule 303(a)(1), governing appeals from final judgments of the circuit court in civil cases, provides that "[t]he notice of appeal must be filed with the clerk of the circuit court within 30 days after the entry of the final judgment appealed from, or, if a timely posttrial motion directed against the judgment is filed, *** within 30 days after the entry of the order disposing of the last pending postjudgment motion directed against that judgment or order."  Ill. S. Ct. R. 303(a)(1) (eff. May 30, 2008).  At the same time, Rule 304(b)(3) provides that "[a] judgment or order granting or denying any of the relief prayed in a petition under

section 2-1401" is appealable without a special finding. Ill. S. Ct. R. 304(b)(3) (eff. Feb. 26, 2010).

¶ 44    The supreme court rules do not explicitly state whether a motion for reconsideration of a dismissal of a section 2-1401 petition is construed as a "timely posttrial motion directed against the judgment" that tolls the time to file a notice of appeal pursuant to Rule 303(a).  In other words, it is not immediately apparent from the rules whether the filing of a motion to reconsider the denial of a section 2-1401 petition permits the appellant to file a notice of appeal up to 30 days following the denial of the motion to reconsider.  EDC notes that, in a 1980 case concerning a petition brought under section 72 (section 2-1401's statutory predecessor), this court held that "[m]otions to reconsider the court's ruling on a section 72 petition should not be used to toll the time for appeal."  *Dempster Plaza State Bank v. American National Bank & Trust Co. of Chicago*, 83 Ill. App. 3d 870, 873 (1980).

¶ 45    However, our supreme court has since decided this question in favor of allowing appellate jurisdiction, holding that "it is fairly inferable that the timing of a Rule 304(b)(3) appeal is to be governed by Rule 303(a)(1), *including its provision for a toll following a post-trial motion.*"  (Emphasis added.)  *Elg v. Whittington*, 119 Ill. 2d 344, 355 (1987) (noting that "section 2-1401 actions are not simply continuations of previous actions but new causes of action, and therefore parties against whom section 2-1401 judgments have been rendered should enjoy the same appellate rights as all other appellants" (*id.* at 355-56)); see also *Burnicka v. Marquette National Bank*, 88 Ill. 2d 527, 530-31 (1982) (holding that a motion to reconsider an order granting a petition under section 72 tolled the time for filing a notice of appeal).

¶ 46    Under our supreme court's interpretation of Rules 303(a)(1) and 304(b)(3), Emma's notice of appeal was timely. That is, although Emma did not file a notice of appeal within 30 days of the June 2013 denial of her section 2-1401 petition, she filed a motion for rehearing of the trial court's ruling within 30 days. Because she did so, pursuant to Rule 303(a)(1) her time to file a notice of appeal was extended to "30 days after the entry of the order disposing of" that motion for rehearing. Emma filed her notice of appeal on September 19, 2013, within 30 days after the September 4, 2013 denial of her motion for rehearing. Accordingly, we have jurisdiction.

¶ 47    We thus turn to the merits of Emma's appeal. Although the trial court dismissed Emma's amended section 2-1401 petition on the basis of "lack of diligence," we conclude that dismissal was independently warranted on other grounds. First, our court has held that, due to the provisions of the Illinois Mortgage Foreclosure Law (Foreclosure Law), a section 2-1401 petition cannot be asserted in an effort to vacate the circuit court's confirmation of a foreclosure sale. See *U.S. Bank National Ass'n v. Prabhakaran*, 2013 IL App (1st) 111224.

¶ 48    In *Prabhakaran*, as in this case, the prior owner filed a section 2-1401 petition seeking to vacate a foreclosure judgment and the circuit court's order confirming the judicial sale of the foreclosed property to a bank (U.S. Bank). *Id.* ¶ 1. However, U.S. Bank asserted that "section 15-509(c) of the Foreclosure Law barred the defendant's section 2-1401 petition as a matter of law because the selling officer had already delivered a deed to U.S Bank following the circuit court's order confirming sale of the property." *Prabhakaran*, 2013 IL App (1st) 111224, ¶ 26. Section 15-1509(c) of the Foreclosure Law states that the "vesting of title" to property by delivery of a deed following a foreclosure sale, "unless otherwise specified in the judgment of

foreclosure, *shall be an entire bar of \*\*\* all claims of parties to the foreclosure*." (Emphasis added.) 735 ILCS 5/15-1509(c) (West 2012). Our court agreed with U.S. Bank's argument in *Prabhakaran*, finding "[t]here is simply no Illinois authority to support the defendant's argument that she can utilize section 2-1401 to circumvent \*\*\* section 15-1509(c) of the Foreclosure Law after the circuit court confirmed the sale of the property." *Prabhakaran*, 2013 IL App (1st) 111224, ¶ 30. We concluded that "[t]he clear and unambiguous language of section 15-509(c) of the Foreclosure Law bars the defendant's claims in her section 2-1401 petition and is dispositive." *Id.* As in *Prabhakaran*, we hold that section 15-1509(c) of the Foreclosure Law applies in this case to bar Emma's section 2-1401 petition.

¶ 49 Moreover, just as section 15-1509(c) of the Foreclosure Law limits the claims that may be asserted after the judicial sale of foreclosed property, section 2-1401(e) of the Code of Civil Procedure similarly precludes a section 2-1401 petition from affecting the disposition of property transferred to a third party after the entry of the challenged judgment. See 735 ILCS 5/2-1401(e) (West 2012). Section 2-1401(e) provides that "the vacation or modification of an order or judgment pursuant to [section 2-1401] does not affect the right, title or interest in or to any real or personal property of any person, not a party to the original action, acquired for value after the entry of the order or judgment but before the filing of the petition." *Id.* In this case, Emma's property was transferred for value to EDC—which was not a party to the original action—in June 2012, after the September 2011 confirmation of the foreclosure sale and before Emma filed her first section 2-1401 petition. Thus, section 2-1401(e) similarly barred Emma from asserting a section 2-1401 petition attacking EDC's interest in the property.

¶ 50    Even if our holding in *Prabhakaran* and the express language of section 2-1401(e) did not otherwise bar Emma's section 2-1401 petition , we would nevertheless affirm the trial court's dismissal due to her lack of diligence.  Contrary to her arguments on appeal, Emma's petition was subject to due diligence requirements, and the trial court did not abuse its discretion in finding that she failed to show due diligence.  As Emma's arguments implicate recent precedent by our supreme court discussing the types of section 2-1401 petitions and the requisite showing of due diligence, we proceed to address those contentions.

¶ 51    Emma argues that she did not need to show diligence, and in the alternative, claims that any lack of diligence by her should have been excused by her prior attorneys' conduct.  First, Emma argues that her petition was in the nature of a "bill of review for errors or law apparent on the face or the record," and that "[t]his type of [section] 2-1401 petition need not show diligence."  Emma relies heavily on our Second District's decision in *Aurora Loan Services, LLC v. Pajor*, 2012 IL App (2d) 110899, which explained: "Current law recognizes at least three primary types of section 2-1401 petitions.  The most familiar is the 'new facts' type ***.  Also familiar is the petition to vacate a void judgment ***.  A third type, based on errors of law apparent on the face of the record is now rare, but remains viable."  *Id.* ¶ 15.  The Second District stated that our supreme court's 1958 decision in *Collins v. Collins*, 14 Ill. 2d 178 (1958) contains "the best description of this [third] kind of petition."  *Aurora*, 2012 IL App (2d) 110899, ¶ 15.

¶ 52    "In *Collins*, the supreme court noted that section 2-1401 (then section 72 of the Civil Practice Act (Ill. Rev. Stat. 1955, ch. 110, ¶ 72)) incorporated the power, formerly available under bills of review, to vacate final judgments based on legal errors."  *Id.* ¶ 17 (citing *Collins*, 14 Ill. 2d at 182-83).  *Collins* explained that: "Bills of review were formerly available for the

purpose of obtaining relief from decrees for errors apparent upon the face of the record" and were "applicable where the decree was contrary to a rule of law or statutory provision." *Collins*, 14 Ill. 2d at 183. Our Second District in *Aurora* stated that "[u]nlike the usual test applied to \*\*\* section 2-1401 petitions, in a *Collins*-type petition the petitioner need not show diligence." *Aurora*, 2012 IL App (2d) 110899, ¶ 19.

¶ 53    Emma urges that her amended section 2-1401 petition was in the nature of a "bill of review" seeking to correct an error of law apparent on the face of the record, as described in *Collins*. Thus, she argues that her section 2-1401 petition was not subject to any due diligence requirement and could not be dismissed on that basis. As explained below, we disagree with Emma's characterization of her section 2-1401 petition as asserting an error of law. Rather, her section 2-1401 petition was heavily fact-dependent.

¶ 54    Notably, our supreme court has recently examined the types of section 2-1401 petitions. See *Warren County Soil & Water Conservation District v. Walters,* 2015 IL 117783. *Warren County* explained that "a section 2-1401 petition can present either a factual or legal challenge to a final judgment or order," and "the nature of the challenge presented in a section 2-1401 petition is critical because it dictates the proper standard of review on appeal." *Id.* ¶ 31.

¶ 55    *Warren County* noted that the "seminal decision on section 2-1401 practice is *Smith v. Airoom, Inc.*, 114 Ill. 2d 209 (1986)." *Id.* ¶ 36. As explained by *Warren County*: "*Airoom* established that to be entitled to relief from a final judgment or order under section 2-1401, the petition must set forth specific factual allegations supporting each of the following elements: (1) the existence of a meritorious defense; (2) due diligence in presenting this defense or claim to the circuit court in the original action; and (3) due diligence in filing the section 2-1401 petition for

relief."  *Id.* ¶ 37 (citing *Smith v. Airoom, Inc.*, 114 Ill. 2d 209, 220-21 (1986)).  Under *Airoom*,"[t]he question of whether relief should be granted lies within the sound discretion of the circuit court, depending on the facts and equities presented. [Citation.]  Accordingly *** a reviewing court will reverse the circuit court's ruling on the petition only if it constitutes an abuse of discretion."  *Id.* (citing *Airoom*, 114 Ill. 2d at 221).

¶ 56    *Warren County* explained that *Airoom* was a "fact-dependent challenge to a final judgment under section 2-1401.  The primary issue in *Airoom* depended largely on the specific facts of that case, determining whether the defendant's actions and conduct constituted due diligence."  *Id.* ¶ 40.  However, *Warren County* also recognized that "a section 2-1401 petition is not limited to the type of factual challenge involved in *Airoom*" but that "the petition may also raise a legal challenge to a final judgment or order."  *Id.* ¶ 41.

¶ 57    Our supreme court in *Warren County* explained that, "[i]n contrast to the fact-dependent judgment under section 2-1401 in *Airoom*," our supreme court's decision in *People v. Vincent*, 226 Ill. 2d 1 (2007), was "representative of a case involving a purely legal challenge to a final judgment under section 2-1401." *Warren County*, 2015 IL 117783, ¶ 42.  In *Vincent*, in which a criminal defendant's section 2-1401 petition alleged that his sentence of five consecutive 20-year prison terms was void, our supreme court held that the applicable standard of review was *de novo*.  *Vincent*, 226 Ill. 2d at 15-18.  Moreover, *Vincent* did *not* require an analysis of the petitioner's due diligence as part of the applicable standard of review.  See *id.*

¶ 58    In *Warren County*, however, our supreme court clarified that "*Vincent* must be viewed in its narrow context of a section 2-1401 petition that raises a purely legal challenge to a judgment by alleging that it is void under subsection (f) of section 2-1401.  [Citation.]  When viewed in

this context, our decision to apply *de novo* review is consistent with established principles of appellate review for cases involving purely legal questions. [Citation.] Accordingly, to the extent that *Vincent* prohibits equitable considerations in section 2-1401 proceeding, that part of our holding must be limited to a petition raising solely a legal issue." *Warren County*, 2015 IL 117783, ¶ 47.

¶ 59    *Warren County* thus recognized that "a section 2-1401 petition seeking to vacate a void judgment, a purely legal issue, does not need to establish a meritorious defense or satisfy due diligence requirements." *Id. ¶* 48. However, *Warren County* reiterated the due diligence requirements for a fact-dependent petition:

> "[W]e hold that when a section 2-1401 petition presents a fact-dependent challenge to a final judgment or order the standards from *Airoom* govern that proceeding. Thus, the petitioner must set forth specific *factual* allegations supporting each of the following elements: (1) the existence of a meritorious defense; (2) due diligence in presenting this defense; and (3) due diligence in filing the section 2-1401 petition for relief. [Citation.] The quantum of proof necessary to sustain a section 2-1401 petition is a preponderance of the evidence, and the circuit court's ultimate decision on the petition is reviewed for an abuse of discretion." (Emphasis in original.) *Id.* ¶ 51.

*Warren County* thus makes clear that although a section 2-1401 petition raising a purely legal issue does not need to satisfy due diligence requirements, a fact-dependent challenge to a final judgment or order must be supported by specific factual allegations of due diligence.

¶ 60    In this case, we do not agree with Emma's argument that her amended section 2-1401 petition raises a purely legal error, and thus excuses her from due diligence requirements. Rather, it is apparent that her challenge to the underlying judgment confirming the foreclosure sale is fact-dependent.    Specifically, her section 2-1401 petition asserts numerous factual allegations of "predatory lending," "fraud in the inducement," and other misconduct by the bank to support her claim that she did not understand the November 2006 loan transaction.    As her petition presents fact-dependent challenges, it was required to set forth allegations supporting the existence of a meritorious defense, due diligence in presenting the defense, and due diligence in filing the section 2-1401 petition. *Id.*    Further, the abuse of discretion standard applies to the circuit court's determination as to whether these elements were satisfied. *Id.*

¶ 61    As an alternative argument, Emma contends that, even if her section 2-1401 petition is of the type that requires due diligence, the lack of cooperation between her first and second defense attorneys should be deemed to "toll[] the due diligence period" and excuse her delay. Emma urges that, as a section 2-1401 petition "invokes the equitable powers of the trial court" to "prevent enforcement of a judgment when it would be unfair, unjust or inequitable," courts may "relax the due diligence standard where necessary to effect substantial justice."  Although Emma recognizes that a party is "generally bound by the negligence of her legal counsel," she urges that in her case the lack of cooperation by her prior attorneys constitutes "mitigating circumstances" that permit relaxation of the due diligence requirement.  While we empathize with Emma's

situation as an elderly person, who relied upon others to direct, inform and act in her behalf regarding the refinancing of her property and the subsequent legal issues and representation which arose, she still must meet the requirements which would give the trial court the basis to grant her the relief she sought.

¶ 62    Emma is correct to the extent that equitable considerations are taken into account in deciding a section 2-1401 petition.  *Id.* ¶ 50 ("[A] section 2-1401 petition that raises a fact-dependent challenge to a final judgment or order must be resolved by considering the particular facts, circumstances, and equities of the underlying case.")  "The trial court may also consider equitable considerations to relax the applicable due diligence standards under the appropriate limited circumstances."  *Id.* ¶ 51.  Emma is also correct in recognizing that "[a]lthough a party is generally bound by the negligence of his legal counsel, a court *may* refuse to impute such negligence to the client who seeks to vacate a default judgment when mitigating circumstances are present."  (Emphasis added.)  *West Bend Mutual Insurance Co. v. 3RC Mechanical & Contracting Services, LLC*, 2014 IL App (1st) 123213, ¶ 14.

¶ 63    Nonetheless, even if the trial court was *permitted* to relax the due diligence requirements, we cannot say that the trial court abused its discretion in declining to do so in this case.  "A circuit court abuses its discretion when its ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court."  (Internal quotation marks omitted.)  *Bank of America, N.A. v. Adeyiga*, 2014 IL App (1st) 131252, ¶ 116.

¶ 64     In this case, the trial court could reasonably conclude that, notwithstanding Emma's allegations of the failures of her first and second defense counsel, she nonetheless failed to establish due diligence.  Notably, a section 2-1401 petition must satisfy due diligence in two

respects, both "in presenting the defense or claim to the trial court in the original action," as well as "due diligence in filing the section 2-1401 petition." *Charles Austin Ltd. v. A-1 Food Services, Inc.*, 2014 IL App (1st) 132384, ¶ 25.

¶ 65 The trial court could reasonably have concluded that due diligence was lacking in either respect. First, the trial court could conclude that Emma was not diligent in initially presenting her defenses to enforcement of the loan, premised on her allegations of the bank's fraudulent conduct and predatory lending. The default judgment was entered in December 2009. Although the parties dispute when Emma was first served with the foreclosure complaint, it is not disputed that her first attorney appeared in the action in February 2010. However, it was not until September 2010 that Emma (through her second attorney) filed a petition to vacate the December 2009 default judgment, in which she first alleged that the bank engaged in predatory lending and fraud. Moreover, section 2-1401 additionally requires "due diligence in filing the section 2-1401 petition for relief." *Warren County*, 2015 IL 117783, ¶ 51. In this regard, Emma did not file her first section 2-1401 petition until December 2012, over a year after the September 2011 order confirming the February 2011 foreclosure sale of the property. Furthermore, the section 2-1401 petition's allegations of predatory lending and fraud by the bank are largely duplicative of the allegations set forth *over two years earlier* in Emma's September 2010 motion to vacate the default judgment.[2]

---

[2]Emma emphasizes that her amended section 2-1401 petition, unlike her previous filings, relied upon the court-appointed receiver's report from August 2009—which reflected that only $3850 in rent had been paid by the property's tenants from June to August 2009— as factual support for her allegation that the bank's employee falsely stated on her 2006 loan application that the property's apartments were fully occupied by tenants paying $800 in monthly rent. However, we can hardly say that the trial court abused its discretion in declining to attach significance to that fact. The suggestion that the rents collected from the property in 2009 is

¶ 66    Moreover, although Emma's appellate argument cites the lack of cooperation between her first two defense counsel as justifying relaxation of the due diligence requirements, the record reflects that her second counsel withdrew from the case in April 2011, and that Emma obtained subsequent counsel by August 2011.  Importantly, her first and second counsel were no longer involved in the case after April 2011.  Therefore, their lack of cooperation with each other offers no explanation for why Emma waited until December 2012, over a year after the September 2011 order confirming the sheriff's sale of the property, to file her original section 2-1401 petition.  Given this record, we cannot say that the trial court abused its discretion in determining that Emma did not satisfy the due diligence requirements of section 2-1401.

¶ 67    Apart from her arguments challenging the dismissal of her amended section 2-1401 petition on the basis of "lack of diligence," Emma's appeal separately argues that the court erred in subsequently denying her motion for rehearing, retrial or modification pursuant to section 2-1203 of the Code of Civil Procedure.  That section provides that in non-jury cases, a party may "within 30 days after the entry of the judgment *** file a motion for a rehearing, or a retrial, or modification of the judgment or to vacate the judgment or for other relief."  735 ILCS 5/2-1203 (West 2012).  The purpose of such a motion "is to bring to the court's attention newly discovered evidence, changes in the law, or errors in the court's previous application of existing law." (Internal quotation marks omitted.)  *Cable America, Inc. v. Pace Electronics, Inc.*, 396 Ill. App. 3d 15, 24 (2009).  The applicable standard of review on such a motion is the deferential abuse of

probative of the rents paid by tenants prior to the loan origination in 2006, over three years prior to the receiver's report, is tenuous at best.  Moreover, Emma does not offer any particular reason why, despite being represented by counsel since early 2010, she did not reference the August 2009 receiver's report until her amended section 2-1401 petition in April 2013.

discretion standard. *Id.* ("The decision to grant or deny a section 2-1203 motion is within the sound discretion of the circuit court.").

¶ 68    Notably, Emma does not contend that her section 2-1203 motion raised any "newly discovered evidence" or factual allegations that were not already contained in her amended section 2-1401 petition or its supporting affidavit, and she does not claim that the section 2-1203 motion was premised upon a change in applicable law.  Rather, her section 2-1203 motion simply urged the trial court to reconsider its determination that she had failed to demonstrate due diligence.  However, as we have explained above, we cannot say that the trial court abused its discretion in concluding that she failed to show due diligence.  Moreover, as we have also found that Emma's section 2-1401 petition was independently barred by our holding in *Prabhakaran*, 2013 IL App (1st) 111224, and by the terms of section 2-1401(e), we cannot conclude that the trial court erred in denying her motion to reconsider.

¶ 69    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 70    Affirmed.